1

2

3

4

5

6

7

8              UNITED STATES DISTRICT COURT

9              NORTHERN DISTRICT OF CALIFORNIA

10

11    EDNALYN C. MARTIN,                        No. C-13-05089 DMR

12            Plaintiff(s),

                                                **ORDER DENYING PLAINTIFF'S**
13        v.                                    **MOTION FOR SUMMARY JUDGMENT**
                                                **AND GRANTING DEFENDANT'S**
14    CAROLYN W. COLVIN,                         **MOTION FOR SUMMARY JUDGMENT**

15            Defendant(s).
      _____/

16

17            Pursuant to 42 U.S.C. § 405(g), Plaintiff ("Plaintiff") seeks review of her application for

18    disability insurance benefits.  Defendant Social Security Commissioner ("Defendant" or

19    "Commissioner") denied her application after determining that Plaintiff was not disabled under Title

20    II of the Social Security Act, 42 U.S.C. §§ 401 *et seq*.  Plaintiff now requests judicial review of the

21    Commissioner's decision pursuant to 42 U.S.C. § 405(g).  Both parties filed motions for summary

22    judgment.  For the reasons stated below, the court **denies** Plaintiff's motion for summary judgment

23    and **grants** Defendant's motion for summary judgment.

24                              **I.  Procedural History**

25            On May 17, 2010, Plaintiff protectively filed an application for disability insurance benefits

26    under Title II of the Act, alleging disability beginning April 23, 2010.  A.R. 88, 146-54.  The agency

27    denied Plaintiff's application for benefits initially on June 23, 2011 and subsequently denied it again

28    upon reconsideration.  A.R. 116-20.  On March 21, 2012, Administrative Law Judge (ALJ) John

**United States District Court**
For the Northern District of California

United States District Court

For the Northern District of California

Heyer held a hearing at which Plaintiff and her attorney representative were present.  A.R. 54-87.

Plaintiff provided testimony, as did Alena Sala, a vocational expert.  A.R. 54-87.

On April 25, 2012 the ALJ issued a written decision finding Plaintiff not disabled under Title II of the Social Security Act.  A.R. 25-36.  The Appeals Council denied Plaintiff's request for review of the ALJ's decision, making the ALJ's decision the Commissioner's final decision.  A.R. 1-6.  Plaintiff then filed this action.

## II.  Factual Background

### A.  Background

The record contains the following information.  Plaintiff was born in January 1961 and was 49 years old as of the alleged onset date of her disability.  A.R. 146.  Plaintiff was born in the Philippines but is now a citizen of the United States.  A.R. 146.  Plaintiff completed two years of college in 1978 and several months of specialized training as a certified nurse assistant in 1981.  A.R. 173.  Plaintiff worked as a certified nurse assistant for approximately 19 years at Laguna Honda Hospital in San Francisco, from October 1990 to April 2010.  A.R. 178.  Her work as a certified nurse assistant required her to lift patients out of bed and into wheelchairs, bathe patients and brush their teeth, assist patients with eating meals, bring patients to appointments, and take and record patients' vital signs, blood pressure, and temperature.  A.R. 179.

Plaintiff began having problems with her neck and shoulders when she suffered a workplace injury while lifting a patient in 2006.  A.R. 434-35, 578.  A July 2006 MRI of Plaintiff's cervical spine showed discogenic disease at the C5-C6 vertebrae.  A.R. 454.  In February 2007, Plaintiff had left rotator cuff surgery.  A.R. 378-79.  In June 2009, Plaintiff had spinal surgery, which fused several of the vertebrae in her neck together.  A.R. 251-52, 428-29.  Plaintiff left work shortly before her spinal surgery, returned in February 2010 on modified duty (floor patrol), and stopped working altogether in April 2010.  A.R.  60, 65.  Plaintiff has not worked since April 2010.  Plaintiff applied for and was granted a disability retirement from her position on September 2, 2011.  A.R. 250-54.  In December 2012, after the hearing and after the ALJ issued his written decision, Plaintiff had surgery on her right shoulder.  A.R. 624-32.

**United States District Court**
For the Northern District of California

Plaintiff testified that her pain was worse after her spinal surgery, and that after her surgery she could not do the household chores she used to be able to do.  A.R. 71.  She testified that she could only lift five pounds, and could only stand for about 15 minutes until she started experiencing discomfort, and 25 minutes before she would have to stop standing.  A.R. 60-61.  She could sit only 15-25 minutes and walk 10-15 minutes (which she estimated to be half a block in distance).  A.R. 61, 75.  She experienced pain in her neck and right shoulder, radiating to her lower back, as well as her left shoulder.  She also complained of muscle spasms, and numbness and tingling in both arms and hands.  A.R. 71-72.  She testified that she experienced five headaches a week, each of which lasted half a day.  A.R. 73.  She had difficulty grasping and frequently dropped things.  A.R. 73-74.  Plaintiff testified that she had difficulty looking side-to-side or up-and-down, and would have to turn her whole body just to look to the side.  A.R. 71.  Plaintiff stated that she was "always" in pain.  A.R. 72.  Plaintiff's pain interfered with her sleep, and she testified that she could only sleep four hours during the night before waking up with pain.  A.R. 77.

Plaintiff testified that on a typical day, she woke, had breakfast, sat for a while, took a shower, and then had to rest and lie down because of pain.  A.R. 62.  In the evenings, she waited for her daughter or husband to prepare dinner, and she attempted to assist with chores.  A.R. 62.  Plaintiff sometimes did the dishes, sometimes went shopping with her daughter or husband, and also watched television, used a computer, and read.  A.R. 63, 76.  Plaintiff stated that she took medications (Naprosyn, Zanaflex, Prilosec, Zoloft, and Aleve) that temporarily helped her.  A.R. 64.  Plaintiff had difficulty driving because she could not look from side to side, but she did drive to pick up her grandchildren twice a week from their school approximately one mile from her house.  A.R. 75-76, 78.

Plaintiff also testified about her depression.  A.R. 69.  Plaintiff stated that her primary care physician Dr. Sally Yu had referred her to psychologist Dr. John Guzman for mental health treatment.  A.R. 69.  Plaintiff's depression made her want to be alone and not mingle with people, and affected her concentration and memory.  Plaintiff gave the example of forgetting once to pick up her grandchildren from school.  A.R. 69-70.  She testified that the Zoloft was helpful in alleviating

**United States District Court**
For the Northern District of California

1    her problems, but only for a short time.  At the time of the hearing, Plaintiff was not receiving

2    mental health care.  A.R. 67.

3    **B.  Letters from Relatives and Acquaintances**

4         The record includes several letters from Plaintiff's relatives and acquaintances.  A.R. 214-

5    222.  Plaintiff's neighbor Idalina Chan stated that she used to see Plaintiff "outside the house

6    sweeping the driveway, cleaning the front door or working in the yard," and would socialize with

7    Plaintiff.  After Plaintiff's surgery, Chan saw Plaintiff less often outside of Plaintiff's house, and

8    they would still chat, but "perhaps within less than 20 minutes" Plaintiff would have to go back into

9    the house because she felt tired.  Chan also noticed Plaintiff walking slower and holding onto walls

10   and rails for support.  A.R. 214.

11        Plaintiff's friend of 24 years Nimfa Torrijos-Fernandez stated that she and Plaintiff "used to

12   go out for lunch or dinner" and Torrijos-Fernandez would see Plaintiff in church every Sunday.

13   Torrijos-Fernandez stated that she now "seldom" sees Plaintiff in church and that when Torrijos-

14   Fernandez visited Plaintiff, "[t]here are days when . . . she'll be lying in bed or in the [couch] and

15   won't get up, still in her pajamas it's either she is in a severe pain or feeling frustrated that she can't

16   do her house chores and things that she always wanted to do before she got hurt."  A.R. 215.

17   Torrijos-Fernandez also noted that Plaintiff's "memory was really good before, but now she forgets

18   things easily and I have to remind her to write things down," and it "seems like she cannot focus on

19   what she's doing for more than 20 minutes."  A.R. 215.

20        Plaintiff's daughter Katherine Martin, who was 29 years old at the time of the hearing,

21   provided a letter that stated that Plaintiff used to be a very outgoing person who enjoyed the family's

22   annual road trips to Reno, but now mostly stayed home and rested.  Martin stated that Plaintiff has

23   good and bad days, and "[o]n a good day she will get up and go to church with my dad and out to

24   breakfast."  A.R. 216.  Plaintiff's daughter also stated that Plaintiff's "condition limits her from

25   having the outgoing social life that she had."  A.R. 216.

26        The record also includes a letter from Plaintiff's nephew and her husband Alfredo Martin.

27   A.R. 218-222.  Both describe the drop in Plaintiff's mood, energy, abilities, and socializing, and

28   increase in her pain, since her surgeries.  A.R. 218-222.

**C. Plaintiff's Relevant Medical History**

    **A. 2006-2012: Dr. Jeffrey Halbrecht**

    The record includes treatment records from by Dr. Jeffrey Halbrecht, an orthopedic surgeon, from August 2006 until January 6, 2012.  A.R. 373, 377-380, 402-412, 454, 451, 531-535.

    **1. 2006-2007: Records Prior to Left Shoulder Surgery**

    On August 6, 2006, Dr. Halbrecht recommended surgery on Plaintiff's left shoulder, which he performed on February 2, 2007.  A.R. 251.  Dr. Halbrecht declared Plaintiff's shoulder to be permanent and stationary as of October 16, 2007.  A.R. 251.

    **2. 2010-2011: Records Regarding Right Shoulder**

    The record includes a progress report from Dr. Halbrecht regarding Plaintiff's right shoulder dated January 5, 2010.  A.R. 471-72.  Dr. Halbrecht noted that Plaintiff complained of pain in her right shoulder and tingling in her fingers.  Dr. Halbrecht conducted a physical examination and found "no neurologic findings other than the complaints of tingling in the radial aspect of the index finger" and "mild impingement findings, mostly AC joint discomfort and pain with AC joint compression testing."  A.R. 471.  Dr. Halbrecht's impression was AC joint arthrosis in Plaintiff's right shoulder and mild associated impingement findings, for which he recommended (and performed) a cortisone injection.  A.R. 472.

    In a report about Plaintiff's right shoulder dated April 8, 2011, Dr. Halbrecht noted that "[t]here is minimal change in [Plaintiff's] exam" and that Plaintiff "still has loss of 10 degrees of active range of motion in all planes and has pain with extremes of range of motion, especially abduction and flexion."  A.R. 451.  Dr. Halbrecht noted Plaintiff's muscle strength testing to be 4/5. His impression was that Plaintiff had "persisting pain and weakness and development of levator scapulae syndrome due to complications."  A.R. 451.  Dr. Halbrecht recommended physical therapy to increase Plaintiff's range of motion and strength, and to relieve Plaintiff's levator scapulae syndrome.  A.R. 451.  Dr. Halbrecht also recommended that Plaintiff continue to take anti-inflammatories, apply ice, and continue to take her other medications.  A.R. 451.

    Dr. Halbrecht recommended that Plaintiff undergo physical therapy for her right shoulder. A.R. 538-48.  The medical evidence of record shows that Plaintiff visited a physical therapist eight

times over four weeks between April and May 2011.  A.R. 538-48.  After eight visits, Plaintiff's

physical therapist "recommended that [Plaintiff] discontinue with her conservative care in Physical

Therapy in lieu of a home exercise program" and "discharged [Plaintiff from physical therapy]

because she has achieved her goals and expected outcomes."  A.R. 548.

Dr. Halbrecht treated Plaintiff on about 10 occasions between April 2011 and January 2012,

but there are no detailed treatment notes in the record from these visits.  A.R. 534-35.

### 3.  2012: Records Regarding Right Shoulder Provided After ALJ Decision

The record also includes notes and reports from Dr. Halbrecht dated after April 2012, which

were submitted after the ALJ's written decision.[1]  A.R. 624-32.  These records show that an MRI

performed on Plaintiff's right shoulder in April 2012 revealed "significant partial tearing" of

Plaintiff's right rotator cuff and "significant SLAP[2] tear" causing ongoing symptoms despite

extensive conservative management over several years. A.R. 624-28.

On May 3, 2012, Dr. Halbrecht performed a physical examination on Plaintiff, and found

that Plaintiff had difficulty lifting her arm above shoulder height, had pain with impingement

maneuvers, and weakness of the supraspinatus tendon, but also found that Plaintiff's "range of

motion passively is normal but with pain at the extremes of motion."  A.R. 627.

On December 5, 2012, Dr. Halbrecht performed surgery on Plaintiff's right shoulder.  A.R.

631-32.

### B. 2009-2010: Dr. Bruce McCormack

---

[1]  Their letters were accepted as evidence by the Appeals Council, *see* A.R. 1-6, and thus this court must consider those letters part of the administrative record.  *Brewes v. Comm'r of Soc. Sec. Admin.*, 682 F.3d 1157, 1159-60 (9th Cir. 2012) ("[W]hen a claimant submits evidence for the first time to the Appeals Council, which considers that evidence in denying review of the ALJ's decision, the new evidence is part of the administrative record, which the district court must consider in determining whether the Commissioner's decision is supported by substantial evidence.").
    The Appeals Council denied Plaintiff's request for review stating that it "considered the additional evidence . . . . [and] found that this information does not provide a basis for changing the Administrative Law Judge's decision."  A.R. 1-2.

[2]  Defendant avers that "SLAP" means superior labrum from anterior to posterior.

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

1    On January 7, 2009, treating physician Dr. Bruce McCormack saw Plaintiff regarding

2    Plaintiff's neck pain. Dr. McCormack's impression was cervical disc syndrome with radiculopathy,

3    for which he recommended spinal surgery. A.R. 496.

4    On June 16, 2009, Dr. McCormack performed a spinal fusion surgery on Plaintiff. A.R. 428-

5    29. In report about Plaintiff's follow-up visits after the surgery, Dr. McCormack was generally

6    optimistic about Plaintiff's condition, although he noted when Plaintiff complained of pain. *See*

7    A.R. 490 (report dated July 29, 2009; "Overall satisfactory course. She is not using pain medication.

8    She still has some numbness in the tip of the right thumb . . . . The right arm may be slightly weaker.

9    She overall feels she has improved."); 485 (report dated September 2, 2009; "The bone graft is in

10   good condition and healing well . . . . I anticipate Permanent and Stationary status in October."); 484

11   (report dated September 25, 2009; "[Plaintiff] had a recent flare-up with pain and paresthesias in her

12   right arm. If she flexes her neck, she gets numbness and tingling in her legs . . . . She has secondary

13   complaints of swallowing difficulty. Last x-rays showed the bone graft and plate in good

14   position."); 479 (report dated December 21, 2009; Plaintiff's neck was "approaching Permanent and

15   Stationary status," but Plaintiff complained of pain in her right shoulder, for which Dr. McCormack

16   recommended that Plaintiff follow up with Dr. Halbrecht).

17   In a report dated February 1, 2010, Dr. McCormack declared Plaintiff to be permanent and

18   stationary with respect to her neck. A.R. 466-68, 70. Dr. McCormack noted that x-rays of

19   Plaintiff's neck from December 2009 showed a solid spinal fusion, and electrical studies from

20   October 2010 were negative for neuropathy. A.R. 267. Dr. McCormack performed a physical

21   examination of Plaintiff and stated that she could "do permanent modified duty" that included lifting

22   20 pounds frequently, 30 pounds occasionally, no repetitive overhead work, and no pushing or

23   pulling greater than 25 pounds. A.R. 468. Dr. McCormack stated that Plaintiff's future care "is

24   medication, shots and surgery for adjacent segment disease." A.R. 468.

25   In a report dated March 1, 2010, Dr. McCormack noted that he had seen Plaintiff for follow-

26   up in his clinic. A.R. 465. Dr. McCormack stated that Plaintiff had been working on modified duty,

27   wherein Plaintiff "walks around and monitors the floor, etc." for six hours a day. A.R. 465. Dr.

28   McCormack stated that he was "increasing her to eight hours a day," and that no additional surgery

1  was warranted.  A.R. 465.  Dr. McCormack stated, "I anticipate she could work in some permanent

2  modified duty."  A.R. 465.

3  **C.  2008-2010: Dr. Alfredo Fernandez**

4       The record also includes several evaluations from examining physician Alfredo Fernandez.

5  A.R. 322-23, 324-33, 453-62.  In an evaluation dated January 31, 2008, Dr. Fernandez opined that

6  Plaintiff was permanent and stationary with respect to her left shoulder, but not permanent and

7  stationary with respect to her cervical spine.  A.R. 331.  In an evaluation dated August 6, 2008, Dr.

8  Fernandez opined that Plaintiff would be able to lift 50 pounds on occasion, and would be able to

9  continue doing her usual and customary work.  A.R. 323.

10       Dr. Fernandez also provided an evaluation dated September 7, 2010.  A.R. 453-62.  With

11  respect to Plaintiff's left shoulder, Dr. Fernandez found Plaintiff's condition "unchanged" since his

12  last evaluation.  A.R. 459.  With respect to Plaintiff's cervical spine, Dr. Fernandez noted that

13  Plaintiff had undergone a spinal fusion surgery since his last evaluation.  A.R. 459.  Dr. Fernandez

14  opined that Plaintiff's cervical spine condition was permanent and stationary as of the date of the

15  evaluation.  A.R. 459.  Dr. Fernandez performed a physical examination of Plaintiff, and found

16  "moderate paraspinal spasm in the cervical spine" with "moderate decreased range of motion,"

17  normal range of motion and motor strength in Plaintiff's shoulders, elbows, forearms, hands, wrists,

18  and fingers, and full range of motion in Plaintiff's lumbar spine. A.R. 456-57, 459.  The only

19  specific work restrictions Dr. Fernandez stated in this evaluation were that Plaintiff's spine

20  precluded her from repetitive motions of the neck and at or above shoulder level lifting of more than

21  15 pounds.  A.R. 459.  Dr. Fernandez anticipated that Plaintiff's future medical treatment would

22  include "occasional doctor visits of six to eight a year with the judicious use of nonsteroidals, as

23  well as over-the-counter mild analgesics."  A.R. 461.  During times of "flare-up," which Dr.

24  Fernandez expected to be "approximately two per year," Dr. Fernandez opined that Plaintiff's

25  treatment should include prescription medicines and 12 treatments of physical therapy per flare-up."

26  A.R. 461.  Dr. Fernandez opined that Plaintiff "will not be able to resume her usual and customary

27  work."  A.R. 461.

28  **D.  2010: Dr. Matthew Johnson**

United States District Court
For the Northern District of California

8

**United States District Court**
For the Northern District of California

The record includes an orthopedic evaluation by examining physician Dr. Matthew Johnson dated August 21, 2010. A.R. 434-439. Dr. Johnson noted that Plaintiff "continues to have some amount of neck pain with radiation to upper extremities and has developed some lower back pain but has not had imaging of her lower back today" and "also reports some shoulder pain, which is related to her neck pain." A.R. 438. Dr. Johnson noted "decreased range of motion at the cervical spine consistent with fused cervical spine" and "mildly decreased range of motion at the lumbar spine with some generalized paravertebral tenderness at the neck and the back." A.R. 438. Dr. Johnson found that Plaintiff "has normal motor strength of upper extremities," "[n]ormal reflexes of upper and lower extremities," "altered sensation at the right index fingers, but no other areas of altered sensation," and "no indication of myelopathy or radiculopathy on today's examination." A.R. 438.

Based on these findings, Dr. Johnson found that Plaintiff can lift and carry 20 pounds occasionally and 10 pounds frequently; could stand and walk six hours out of an eight-hour workday; occasionally push and pull with upper and lower extremities of light to moderate weight objects including use of hand and foot control; could occasionally climb, stoop, kneel, and crouch; could not do any vertical climbing because she could not extend her neck enough to look overhead; had no manipulative limitations in regards to reaching in any direction or gross or fine manipulation; and had no visual communicative, or workplace limitations at that time. A.R. 438.

**E.  2011: Dr. Frank Chen**

Examining physician Dr. Frank Chen provided an internal medicine evaluation report dated May 18, 2011. A.R. 521-23. Dr. Chen performed a physical examination and noted that Plaintiff was "well-developed and well-nourished" and showed "no acute distress." A.R. 522. Plaintiff's range of motion was within normal limits in all respects except as to her cervical range of motion. A.R. 522. Plaintiff's muscle bulk and tone were normal, and her strength in upper and lower extremities as well as grip strength were 5/5. A.R. 523. With respect to Plaintiff's activities of daily living, Dr. Chen noted that Plaintiff was able to do light housework and wash dishes, watch television, use the computer, listen to music, read, walk, do some exercise, and drive a car. A.R. 521. Dr. Chen's diagnosis was that Plaintiff had chronic pain in her neck and shoulders, and chronic

1   low back pain with negative exam. Dr. Chen stated that Plaintiff had "no functional limitations on a

2   medical basis." A.R. 523.

3   **F. 2011: Dr. Guzman and Angel Beato**

4         The first medical evidence in the record regarding Plaintiff's mental health is an office visit

5   dated June 17, 2011 with Plaintiff's treating physician Dr. Sally Yu, who noted that Plaintiff's chief

6   complaint was a spider bite, but also noted Plaintiff's complaint of anxiety and referred Plaintiff to a

7   behavioral medicine specialist. A.R. 570-71.

8         Upon Dr. Yu's referral, Plaintiff saw treating psychologist Dr. John Guzman, Ph.D. A.R.

9   573. The record includes notes from five visits with Dr. Guzman between July 2011 and September

10   2011. A.R. 573-91.

11         In an office note dated July 7, 2011, Dr. Guzman noted that Plaintiff reported anxiety,

12   restlessness, muscle tension, depression, anhedonia, irritability, decreased energy, and hopelessness

13   beginning about a year prior to the office visit. A.R. 573. Dr. Guzman noted that Plaintiff felt

14   "financial stress" from her election to retire and was still dealing with her physical limitations. Dr.

15   Guzman and Plaintiff discussed ways to deal with Plaintiff's issues, including "ssri tx."[3] A.R. 574.

16   Dr. Guzman's visit diagnosis was that Plaintiff suffered from "major depression, single episode."

17   A.R. 573. Dr. Guzman performed a mental status evaluation on Plaintiff and stated in his notes that

18   Plaintiff's "mental status [was] normal with exception of following: Mood: depressed and anxious."

19   A.R. 574.

20         Dr. Guzman saw Plaintiff again on August 5, 2011. A.R. 577. Dr. Guzman noted that

21   Plaintiff "has not started ssri medication" and recommended referral to the psych department, but

22   Plaintiff "asked to try behavioral activation as discussed last visit before being referred to psych."

23   A.R. 577. Plaintiff stated that she would begin medication and behavioral activation and would

24   follow-up with Dr. Guzman in three weeks. A.R. 577.

25         Dr. Guzman saw Plaintiff five days later, on August 10, 2011. A.R. 580. Dr. Guzman noted

26   that Plaintiff "began exercising daily and feels this is helping her along with the medication." A.R.

27

28       [3] The court infers that "ssri tx" refers to selective serotonin reuptake inhibitor treatment, which is used to address depression.

580.  Dr. Guzman noted that Plaintiff's "main concern was that her friends at work were gossiping about her and saying that she was faking her injury."  A.R. 580.  Plaintiff and Dr. Guzman discussed "strategies to not allow herself to get carried away with the gossip and to limit the amount of work gossip at her home," and Plaintiff "agreed that becoming more active . . . is a good strategy for her." A.R. 580.

Dr. Guzman saw Plaintiff again on August 18, 2011, and Plaintiff reported that she was walking regularly "but only for brief periods" and was "still feeling anxious from time to time." A.R. 584.  Dr. Guzman recommended that Plaintiff participate in individual or group support.  A.R. 584.

The record also includes a note from Plaintiff's office visit with Angel Beato, a psychological social worker, dated September 12, 2011.  A.R. 527.  Mr. Beato noted that Plaintiff complained of anxiety, depression, anhedonia, crying spells, insomnia, irritability, decreased energy, hopelessness, decreased concentration, and recurrent thoughts of death.  A.R. 528.  Mr. Beato performed a mental status examination on Plaintiff and found that Plaintiff's behavior was "normal and tearful," her speech was "normal," her mood was "depressed and sad," her affect was "full range and appropriate," her thought process was "normal," her thought content was "normal," her orientation was "fully-oriented," her attention was "distractible," her concentration was "within normal limits," her memory was "intact recent and intact remote," and her fund of knowledge, impulse control, insight, and judgment were "good" or "normal."  A.R. 529.  Mr. Beato diagnosed Plaintiff as having "major depression, single episode," "phase of life problem," and "chronic pain syndrome."  A.R. 527.  Mr. Beato also noted that Plaintiff had a follow-up appointment with Dr. Guzman.  A.R. 529.

The last treatment note from Dr. Guzman is dated September 15, 2011.  A.R. 588.  Dr. Guzman notes that Plaintiff "reports she is feeling better" and that seeing Mr. Beato "was very helpful."  A.R. 588.  Dr. Guzman and Plaintiff discussed Plaintiff's options and Plaintiff stated she would consider follow-up with Mr. Beato, and would continue taking Zoloft.  A.R. 588.

**G.  2012: Dr. Michael Shore**

After the hearing before the ALJ, the ALJ kept the record open for two weeks, during which time Plaintiff submitted an evaluation prepared by examining psychologist Michael Shore, Ph.D., and Charles Block, one of Dr. Shore's graduate students, dated March 17, 2012.  A.R. 596-611.

Dr. Shore administered various tests on Plaintiff, including an intellectual functioning Full Scale IQ test that showed that Plaintiff's intelligence was in the Borderline range, which was "clearly quite a bit below what would be anticipated given her educational and occupational success."  A.R. 603.  Dr. Shore also noted Plaintiff's low Verbal Comprehension Index score.  A.R. 603.  Dr. Shore opined that "[i]t is clear from this test that Ms. Martin's effective access to her intellectual potential/capacity is quite compromised at this time.  Pain and depression are the source of this compromise."  A.R. 604.  Dr. Shore also found that Plaintiff's problems with abstract reasoning, problem solving, and memory were seen on both simple and complex tasks, "suggesting that this issue will limit Ms. Martin's effectiveness on both routine tasks of daily life and on tasks requiring a higher level of mental flexibility, as are a part of working life."  A.R. 605.  Dr. Shore opined that Plaintiff had "relative strength" in her ability to scan and process visual information, in "processing speed, on those tasks that are simple and familiar and that do not ask for more complex cognitive processing."  A.R. 608.

Dr. Shore stated that "[s]uch problems as seen here are common to those who are in chronic pain, with their pain interfering with their focus, limiting their effective memory and learning [, and] compromising their effective problem solving."  A.R. 608.  Dr. Shore found that Plaintiff's depression "further compromises attention/focus, memory, and problem solving, and further worsens the fatigue that arises with persistent pain."  A.R. 608.

With respect to how these limitations affected Plaintiff's functional capacity in a work setting, Dr. Shore opined that "[t]he identified cognitive problems, those issues with attention/focus/memory/problem solving, primarily limit [Plaintiff's] work capacities as are involved in complex jobs that require independent decsion-making and an ability to adapt and modify one's work as one's duties evolve over time.  Her ability to acquire new job skills is also quite compromised, so it follows, Ms. Martin learning a new job is obstructed, especially for those jobs that require a degree of independent decision and continued learning."  A.R. 619.  Dr. Shore further

United States District Court

For the Northern District of California

opined that Plaintiff would not be able to perform "new work that . . . requires a new set of skills, that involve independent decision making." A.R. 609. Work that is "rote/repetitive, and not physically taxing beyond ordinary demands for persistent focus, attention to details" would be precluded by "the fatigue that can be anticipated to develop over a relatively brief period of time." A.R. 609. Dr. Shore noted that Plaintiff was able to get through Dr. Shore's four-hour examination and testing period, but she was "provided several short breaks" and even then appeared "quite fatigued over time" and was "tired, irritable, her pain at a high level" at the end of the evaluation period. A.R. 602. Dr. Shore opined that "[a]ll of Ms. Martin's problems work together as to obstruct her successful return to work, of any sort." A.R. 609.

Dr. Shore opined that "treatment directed at helping Ms Martin realize some degree of relief from her chronic pain, and her depression, is recommended, as might allow Ms. Martin to achieve what she would dearly love to achieve, a return to either her usual and customary work, or to another job, and with this, better support both herself and her family." A.R. 609. Dr. Shore stated that "[w]ith professional support her chance of winning this fight and returning to work will be optimized." A.R. 609. Dr. Shore characterized Plaintiff's prognosis, with adequate care, as "fair." A.R. 611. Dr. Shore stated that "Ms. Martin can be expected to remain occupationally disabled for the next 12 months, in a best case scenario . . . . but absent appropriate services, little change would be anticipated." A.R. 609. However, Dr. Shore also noted that "those with a combination of chronic pain and depression as is present here have a generally poor prognosis, even with appropriate care. Without such care there is no realistic medical likelihood that Ms. Martin's condition will functionally improve such as to allow her to return to work." A.R. 609.

Dr. Shore also completed a mental RFC assessment dated March 17, 2012. A.R. 620-23. Dr. Shore opined that Plaintiff was moderately limited in her ability to remember locations and work-like procedures, and her ability to understand and remember very short and simple instructions; and markedly limited in her ability to understand and remember detailed instructions. With respect to Plaintiff's concentration and persistence, Dr. Shore found Plaintiff moderately limited in her ability to maintain attention and concentration for extended periods, sustain an ordinary routine without special supervision, work in coordination or proximity to others without

being distracted, make simple work-related decisions; and markedly limited in her ability to carry out detailed instructions, perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances, and complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods.  A.R. 621.  Dr. Shore also found Plaintiff to be markedly limited in her ability to respond appropriately to changes in the work setting.  A.R. 621.

### III.  The Five-Step Sequential Evaluation Process

To qualify for disability benefits, a claimant must demonstrate a medically determinable physical or mental impairment that prevents her from engaging in substantial gainful activity[4] and that is expected to result in death or to last for a continuous period of at least twelve months. *Reddick v. Chater,* 157 F.3d 715, 721 (9th Cir. 1998) (citing 42 U.S.C. § 423(d)(1)(A)). The impairment must render the claimant incapable of performing the work she previously performed and incapable of performing any other substantial gainful employment that exists in the national economy.  *Tackett v. Apfel,* 180 F.3d 1094, 1098 (9th Cir. 1999) (citing 42 U.S.C. § 423(d)(2)(A)).

To decide if a claimant is entitled to benefits, an ALJ conducts a five-step inquiry.  20 C.F.R. §§ 404.1520, 416.920. The steps are as follows:

1.  At the first step, the ALJ considers the claimant's work activity, if any. If the claimant is doing substantial gainful activity, the ALJ will find that the claimant is not disabled.

2.  At the second step, the ALJ considers the medical severity of the claimant's impairment(s). If the claimant does not have a severe medically determinable physical or mental impairment that meets the duration requirement in [20 C.F.R.] § 416.909, or a combination of impairments that is severe and meets the duration requirement, the ALJ will find that the claimant is not disabled

3.  At the third step, the ALJ also considers the medical severity of the claimant's impairment(s). If the claimant has an impairment(s) that meets or equals one of the listings in 20 C.F.R., Pt.

---

[4]  Substantial gainful activity means work that involves doing significant and productive physical or mental duties and is done for pay or profit. 20 C.F.R. §§ 404.1510, 416.910.

404, Subpt. P, App. 1 [the "Listings"] and meets the duration requirement, the ALJ will find that the claimant is disabled.

4.   At the fourth step, the ALJ considers an assessment of the claimant's residual functional capacity ("RFC") and the claimant's past relevant work. If the claimant can still do his or her past relevant work, the ALJ will find that the claimant is not disabled.

5.   At the fifth and last step, the ALJ considers the assessment of the claimant's RFC and age, education, and work experience to see if the claimant can make an adjustment to other work. If the claimant can make an adjustment to other work, the ALJ will find that the claimant is not disabled. If the claimant cannot make an adjustment to other work, the ALJ will find that the claimant is disabled.

20 C.F.R. § 416.920(a)(4); 20 C.F.R. §§ 404.1520; *Tackett,* 180 F.3d at 1098-99.

### IV.  The April 25, 2012 Decision By The ALJ

In the April 25, 2012 decision, the ALJ applied the five-step sequential evaluation to determine whether Plaintiff was disabled. A.R. 25-36. At Step One, the ALJ found that Plaintiff had not engaged in substantial gainful activity since her alleged onset date of April 23, 2010. A.R. 27. At Step Two, the ALJ found that the evidence establish that Plaintiff had the following severe impairments: status post shoulder surgery, status post neck surgery, depression, and anxiety. A.R. 27. At Step Three, the ALJ found that Plaintiff's impairment did not meet or equal a presumptively disabling impairment in the Listings. A.R. 27. With respect to the "B" criteria for Plaintiff's mental impairments, the ALJ found that Plaintiff had a mild restriction in activities of daily living, moderate difficulties in social functioning, moderate difficulties in concentration, persistence and pace, and had experienced no episodes of decompensation. A.R. 28-29.

At Step Four, the ALJ found that Plaintiff was "unable to perform any past relevant work." A.R. 34. The ALJ "acknowledged that the claimant's shoulder pain, neck pain, depression, and anxiety limit her ability to work to some degree. The claimant's physical limitations are addressed . . . by limiting claimant to performing light work and limiting her ability engage in overhead reaching. The claimant's mental impairments are addressed . . . by limiting the claimant to performing only simple and repetitive tasks." A.R. 34. The ALJ then determined that Plaintiff had

United States District Court

For the Northern District of California

1  the "residual functional capacity to perform light work . . . except [Plaintiff]: can sit, stand, and walk

2  for up to 6 hours each out of an 8 hour workday; cannot engage in reaching about shoulder level

3  bilaterally; and can perform simple repetitive tasks." A.R. 29.  At Step Five, the ALJ determined

4  that Plaintiff was not disabled because there were a significant number of jobs in the national

5  economy that Plaintiff could perform, considering her age, education, work experience, and RFC.

6  A.R. 34-35.

## VI.  Standard of Review

8  The ALJ's underlying determination "will be disturbed only if it is not supported by

9  substantial evidence or it is based on legal error." *Magallanes v. Bowen*, 881 F.2d 747, 750 (9th Cir.

10  1989) (internal quotation marks omitted).  "Substantial evidence" is evidence within the record that

11  could lead a reasonable mind to accept a conclusion regarding disability status. *See Richardson v.*

12  *Perales*, 402 U.S. 389, 401 (1971).  It is "more than a mere scintilla" but less than a preponderance.

13  *Id.*  If the evidence reasonably could support two conclusions, the court "may not substitute its

14  judgment for that of the Commissioner" and must affirm the decision. *Jamerson v. Chater*, 112 F.3d

15  1064, 1066 (9th Cir. 1997) (citation omitted).  The ALJ is responsible for determining credibility

16  and resolving conflicts in medical testimony, resolving ambiguities, and drawing inferences

17  logically flowing from the evidence. *Allen v. Heckler*, 749 F.2d 577, 579 (9th Cir. 1984); *Sample v.*

18  *Schweiker*, 694 F.2d 639, 642 (9th Cir.1982); *Vincent ex. rel. Vincent v. Heckler*, 739 F.2d 1393,

19  1394-95 (9th Cir. 1984). "Finally, the court will not reverse an ALJ's decision for harmless error,

20  which exists when it is clear from the record that the ALJ's error was inconsequential to the ultimate

21  nondisability determination." *Tommasetti v. Astrue*, 533 F.3d 1035, 1038 (9th Cir. 2008) (citations

22  and internal quotation marks omitted).

## VII.  Discussion

24  Plaintiff argues that the ALJ erred when he found that Plaintiff was not fully credible in

25  describing the severity of her subjective pain testimony.  Plaintiff also contends that the ALJ erred

26  by rejecting Dr. Shore's opinion.

27  **A.  Credibility of Plaintiff's Subjective Pain Testimony**

28

Plaintiff argues that the ALJ improperly discounted her subjective pain testimony, and challenges the ALJ's finding that Plaintiff's statements concerning the intensity, persistence, and limiting effects of her symptoms were not fully credible. A.R. 31. The court will examine this finding to determine whether it was supported by substantial evidence. *See Thomas v. Barnhart*, 278 F.3d 947, 950 (9th Cir. 2002) (the court may not second-guess the ALJ's credibility finding if it is supported by substantial evidence in the record).

In deciding whether to admit a claimant's subjective complaints of pain, the ALJ must engage in a two-step analysis. *Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1196 (9th Cir. 2004) (citing *Smolen v. Chater*, 80 F.3d 1273, 1281 (9th Cir. 1996)). First, "the claimant must produce objective medical evidence of underlying 'impairment,' and must show that the impairment, or a combination of impairments, 'could reasonably be expected to produce pain or other symptoms.'" *Id.* (quoting *Smolen*, 80 F.3d at 1281-82). The *Smolen* court further elaborated on this requirement:

> The claimant need not produce objective medical evidence of the pain or fatigue itself, or the severity thereof. Nor must the claimant produce objective medical evidence of the causal relationship between the medically determinable impairment and the symptom. By requiring that the medical impairment could reasonably be expected to produce pain or another symptom, [this step] requires only that the causal relationship be a reasonable inference, not a medically proven phenomenon . . . . This approach reflects the highly subjective and idiosyncratic nature of pain and other such symptoms.

*Smolen*, 80 F.3d at 1282 (citations omitted). The ALJ found that Plaintiff had satisfied this first step of the analysis. A.R. 23.

If the first step is satisfied, then the ALJ may consider whether the claimant's statements about the intensity, persistence, and limiting effects of those symptoms are credible and consistent with objective medical evidence. *Lingenfelter v. Astrue*, 504 F.3d 1028, 1036 (9th Cir. 2007); 20 C.F.R. § 416.929(c). If an ALJ discredits a claimant's subjective symptom testimony, the ALJ cannot rely on general findings, but "must specifically identify what testimony is credible and what evidence undermines the claimant's complaints." *Greger v. Barnhart*, 464 F.3d 968, 972 (9th Cir. 2006) (quotations omitted). The ALJ must support a finding that the claimant's subjective testimony is not reliable with specific, clear and convincing evidence from the record. *Thomas*, 278 F.3d at 958-59. The ALJ may consider "ordinary techniques of credibility evaluation," including the claimant's reputation for truthfulness and inconsistencies in testimony, and may also consider a

United States District Court

For the Northern District of California

claimant's daily activities, and "unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment."  *Smolen*, 80 F.3d at 1284.

The ALJ gave several reasons for discounting Plaintiff's subjective pain testimony. First, with respect to Plaintiff's testimony regarding her neck pain, the ALJ found that Plaintiff's testimony was not supported by objective medical evidence.  A.R. 31.  The ALJ noted that Plaintiff "has some limitation in her ability to perform work related functions due to her neck impairment and these restrictions are reflected by limiting the claimant to performing light work only."  A.R. 31. However, "diagnostic imaging and therapy records do not substantiate the claimant's subjective complaints of completely disabling pain in her neck."  A.R. 31.  Specifically, diagnostic imaging studies from after Plaintiff's surgery noted a solid spine fusion, and electrical studies from October 2010 for Plaintiff's neuropathy were "negative."  A.R. 32, 467.  The ALJ also gave "great weight" to the opinion of examining physician Dr. Fernandez, who evaluated Plaintiff in September 2010 and found that Plaintiff's cervical spine condition was permanent and stationary and that Plaintiff had a "moderate decreased range of motion,"  Dr. Fernandez specified that Plaintiff's only work restrictions were that Plaintiff's spine precluded her from repetitive motions of the neck and at or above shoulder level lifting of more than 15 pounds.  A.R. 32, 459.  The ALJ also gave great weight to the opinion of Dr. Johnson, whose consultative examination in August 2010 revealed that Plaintiff has normal motor strength in the upper extremities, and that Plaintiff exhibited no indication of myelopathy or radiculopathy.  A.R. 32-33, 438.  Finally, the ALJ gave some weight to examining physician Dr. Chen's evaluation dated May 18, 2011, in which Dr. Chen found Plaintiff's range of motion to be within normal limits in all respects except as to her cervical range of motion.  Dr. Chen found Plaintiff's muscle bulk and tone to be normal, and her strength in upper and lower extremities as well as grip strength to be 5/5.  Dr. Chen ultimately opined that Plaintiff had "no functional limitations on a medical basis."  A.R. 33, 522-23.  The ALJ gave limited weight to Dr. Chen's opinion to the extent it suggested that Plaintiff's subjective complaints of disabling pain were not substantiated by the medical record.  However, the ALJ rejected Dr. Chen's opinion that Plaintiff had no functional limitations by giving Plaintiff "the benefit of the doubt" in finding that her shoulder and neck impairments cause at least some degree of functional limitation.

United States District Court

For the Northern District of California

Second, the ALJ properly discounted Plaintiff's subjective pain testimony because Plaintiff testified that she needed to turn her entire body to see from side-to-side, but the ALJ observed that Plaintiff "repeatedly looked from side-to-side throughout the hearing without any apparent problem." *See* SSR 96-7P, 1996 WL 374189 *5 ("In instances where the individual attends an administrative proceeding conducted by the adjudicator, the adjudicator may also consider his or her own recorded observations of the individual as part of the overall evaluation of the credibility of the individual's statements.").

Third, with respect to Plaintiff's complaints of pain resulting from her headaches, the ALJ noted that "[t]reatment notes regarding the claimant's headaches are virtually non-existent" and Plaintiff "testified that she takes over the counter medications, including Aleve, to control her headaches." A.R. 32. The ALJ found that "the lack of a treatment record and the fact that claimant has only sought routine and conservative treatment to address her headaches suggests this impairment is not as severe as alleged by the claimant." A.R. 32. The ALJ was permitted to consider these facts when determining the credibility of Plaintiff's testimony. *Smolen*, 80 F.3d at 1284 (ALJ may consider claimant's failure to seek treatment when determining a claimant's subjective pain testimony); SSR 96-7p, 1996 WL 374186 at *7 ("the individual's statements may be less credible if the level or frequency of treatment is inconsistent with the level of complaints"); *Parra v. Astrue*, 481 F.3d 742, 750-51 (9th Cir. 2007) ("evidence of 'conservative treatment' is sufficient to discount a claimant's testimony regarding severity of an impairment).

Fourth, with respect to Plaintiff's complaints about shoulder impairment, the ALJ acknowledged that Plaintiff's "shoulder impairment restricts her ability to perform some work related functions." A.R. 31. However, the ALJ found that "the subjective complaints of a completely disabling shoulder impairment is [sic] not supported by objective evidence in the claimant's record." A.R. 31. The ALJ noted that Plaintiff's left shoulder had sufficiently healed from the February 2007 surgery so that Plaintiff was able to work for several more years before retiring. A.R. 31. In addition, Plaintiff had successfully completed physical therapy for her rightshoulder in May 2011, and was discharged because Plaintiff "achieved her goals and expected outcome." A.R. 31, 548. On this point, Plaintiff argues that the record also includes evidence about

**United States District Court**
For the Northern District of California

Plaintiff's right shoulder that was presented to the Appeals Council after the ALJ's written decision, and that when considered against this new evidence, the ALJ's decision is not supported by substantial evidence. On the one hand, the MRI and need for surgery do demonstrate that there was an objective basis for Plaintiff's subjective pain testimony. A.R. 624-25 (MRI in April 2012 showing "significant partial tearing" of Plaintiff's right rotator cuff and "significant SLAP tear"); 628 (tearing caused ongoing symptoms despite extensive conservative management over several years); 632 (documentation of the surgery Dr. Halbrecht performed on Plaintiff's right shoulder in December 2012). This evidence does support the credibility of Plaintiff's testimony that her pain was disabling. On the other hand, the treatment notes from Dr. Halbrecht during this time do not show that Plaintiff's pain was disabling; instead, Dr. Halbrecht opined on May 3, 2012 that Plaintiff had difficulty lifting her arm above shoulder height, had pain with impingement maneuvers, and weakness of the supraspinatus tendon, but also found that Plaintiff's "range of motion passively is normal but with pain at the extremes of motion." A.R. 627-28. Thus, even considering this new evidence, the ALJ's decision to discount Plaintiff's subjective pain testimony regarding the pain from her right shoulder is still supported by substantial evidence in the record.

Fifth, with respect to Plaintiff's depression and anxiety, the ALJ noted that the "treatment record for these conditions are sparse and unremarkable." A.R. 32. As described above, the only evidence in the record regarding Plaintiff's treatment for her mental health issues is notes from five visits with Dr. Guzman and one visit to social worker Angel Beato, all occurring between July and September 2011 A.R. 527-28, 573-91. Although both Dr. Guzman and Mr. Beato diagnosed Plaintiff as having depression, "the opinion of the treating physician is not necessarily conclusive as to either the physical condition or the ultimate issue of disability." *Thomas v. Barnhart*, 278 F.3d 947, 956 (9th Cir. 2002) (citation omitted). The treatment notes are generally unremarkable and advise conservative treatment for Plaintiff's depression. *See* A.R. 580 (Dr. Guzman noting that Plaintiff "began exercising daily and feels this is helping her along with the medication" and that that Plaintiff's "main concern was that her friends at work were gossiping about her and saying that she was faking her injury"); 584 (Dr. Guzman noting that Plaintiff reported "still feeling anxious from time to time"); 527-29 (Mr. Beato documenting Plaintiff's complaints, and noting that Plaintiff

United States District Court

For the Northern District of California

had a follow-up appointment with Dr. Guzman); 588 (Dr. Guzman noting that Plaintiff "reports she is feeling better" and that seeing Mr. Beato "was very helpful").  There was no further evidence in the record regarding any other mental health treatment, and during the hearing, Plaintiff testified that she was not receiving mental health care.  A.R. 67.  Evidence of conservative treatment only can be inconsistent with a finding of disabling pain.  *See Tommasetti*, 533 F.3d at 1039 (ALJ permissibly inferred that claimant's pain was "not as all-disabling as he reported" because he did not seek an aggressive, alternative, or more-tailored treatment program); *Parra v. Astrue*, 481 F.3d 742 (9th Cir. 2007) ("We have previously indicated that evidence of 'conservative treatment' is sufficient to discount a claimant's testimony regarding severity of an impairment.") (citation omitted).  Thus the ALJ properly discounted Plaintiff's testimony regarding the severity of her mental health limitations because the treatment record was sparse and unremarkable.  *Smolen*, 80 F.3d at 1284 (ALJ may consider claimant's failure to seek treatment when determining a claimant's subjective pain testimony).

For the above reasons, the ALJ offered specific, clear, and convincing reasons supported by substantial evidence in the record for rejecting Plaintiff's subjective symptom testimony.

**B.  Rejection of Opinion of Dr. Shore**

Plaintiff contends that the ALJ erred by giving "little weight" to Dr. Shore's opinion.

When reviewing an ALJ's medical opinion determinations, courts distinguish between three types of physicians: those who treat the claimant ("treating physicians"); and two categories of "nontreating physicians," those who examine but do not treat the claimant ("examining physicians") and those who neither examine nor treat the claimant ("nonexamining physicians").  *See Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995).  A treating physician's opinion is entitled to more weight than an examining physician's opinion, and an examining physician's opinion is entitled to more weight than a nonexamining physician's opinion.  *Id.*  The ALJ is entitled to resolve conflicts in the medical evidence.  *Sprague v. Bowen,* 812 F.2d 1226, 1230 (9th Cir. 1987).     To reject the opinion of an uncontradicted treating or examining physician, an ALJ must provide "clear and convincing reasons."  *Lester*, 81 F.3d at 830; see also § 416.927(d)(2); SSR 96-2p, 1996 WL 374186.  If another doctor contradicts a treating or examining physician, the ALJ must provide

United States District Court

For the Northern District of California

1    "specific and legitimate reasons" supported by substantial evidence to discount the treating or

2    examining physician's opinion.  *Lester*, 81 F.3d at 830-31.  The ALJ meets this burden "by setting

3    out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his

4    interpretation thereof, and making findings."  *Reddick*, 157 F.3d at 725.  An opinion more consistent

5    with the record as a whole generally carries more persuasiveness.  *See* 20 C.F.R. § 416.927(d)(4).

6         Dr. Shore is an examining, but not treating physician.  Plaintiff recognizes that because Dr.

7    Shore is a psychologist, he is "unqualified to assess" Plaintiff's physical functioning.  Plaintiff

8    instead focuses on Dr. Shore's opinions regarding Plaintiff's mental impairments.  Reply [Docket

9    No. 23] at 3.  Because both Dr. Guzman and Mr. Beato conducted mental status examinations on

10   Plaintiff and opined regarding Plaintiff's mental functioning, *see* A.R. 527, 573, and their opinions

11   contradict Dr. Shore's, the "specific and legitimate" standard governs.

12        First, the ALJ gave "little weight" to Dr. Shore's opinion "because it is inconsistent with the

13   claimant's overall record."  A.R. 33.  As discussed above, the record shows that Plaintiff had limited

14   treatment for her mental health during the period from July 2011 until September 2011, despite

15   reporting that she began experiencing anxiety, depression, and decreased energy starting in mid-

16   2010, and reporting to Dr. Shore that those symptoms were ongoing as of March 2012.  A.R. 573,

17   596.  On July 7, 2011, Dr. Guzman performed a mental status evaluation on Plaintiff and stated in

18   his notes that Plaintiff's "mental status [was] normal with exception of following: Mood: depressed

19   and anxious."  A.R. 574.  Dr. Guzman did not observe the type of mental impairment and fatigue

20   that Dr. Shore observed.  Likewise, on September 12, 2011, Mr. Beato performed a mental status

21   evaluation on Plaintiff and found her thought process, thought content, concentration, memory, fund

22   of knowledge, insight, and judgment to be normal, although he also found Plaintiff to be

23   "distractible."  A.R. 527.  Again, the results of Mr. Beato's examination contradict Dr. Shore's

24   findings of mental impairment and fatigue.  The remainder of the treatment notes from Plaintiff's

25   treating psychologist and social worker are unremarkable or optimistic.  *See* A.R. 588 (Dr.

26   Guzman's final treatment note stating that Plaintiff "reports she is feeling better" and that seeing Mr.

27   Beato "was very helpful").  Plaintiff reported to Dr. Guzman that her "main concern was that her

28   friends at work were gossiping about her and saying that she was faking her injury."  A.R. 580.

United States District Court

For the Northern District of California

1    There is no evidence in the record that Plaintiff followed up on Dr. Guzman's recommendations to

2    be referred to the psych department for possible participation in group therapy.  A.R. 590.  Thus the

3    ALJ's finding that Dr. Shore's opinion was inconsistent with Plaintiff's overall record is supported

4    by substantial evidence.

5         Second, the ALJ noted that Dr. Shore's opinion was inconsistent with Dr. Chen's opinion

6    regarding Plaintiff's physical limitations, Dr. Johnson's opinion, and the evidence of improvement

7    shown through Plaintiff's physical therapy.  A.R. 34.  However, because this evidence concerns

8    Plaintiff's *physical* limitations, it does not provide a specific and legitimate reason for discounting

9    Dr. Shore's opinions about Plaintiff's mental impairments.

10        Third, the ALJ also noted an internal inconsistency in Dr. Shore's opinion.  A.R. 33.

11   Specifically, the ALJ noted that "[d]espite a severely restrictive opinion regarding the severity of the

12   claimant's impairments, Dr. Shore further opines that with appropriate care the claimant would have

13   a chance of returning to work."  A.R. 33.  In response, Plaintiff contends that the ALJ's finding of an

14   internal inconsistency was "a misreading of Dr. Shore's prognosis for [Plaintiff]," because Dr.

15   Shore's prognosis was more dire than the ALJ interpreted it to be.  Mot. [Docket No. 18] at 8.

16   However, Plaintiff's attempt to reconcile what the ALJ identified as an inconsistency in Dr. Shore's

17   opinion treads on territory left to the ALJ.  "The ALJ is responsible for resolving conflicts in

18   medical testimony, and resolving ambiguity.  Determining whether inconsistencies are material (or

19   are in fact inconsistencies at all) . . . falls within this responsibility."  *Morgan v. Comm'r of Soc. Sec.*

20   *Admin.*, 169 F.3d 595, 603 (9th Cir. 1999) (internal inconsistencies within examining physician's

21   report constitute relevant evidence for rejecting physician's report).  Substantial evidence supports

22   the ALJ's determination that Dr. Shore's mild prognosis was inconsistent with his severely

23   restrictive opinion of Plaintiff's impairments, which provides another specific and legitimate reason

24   for discounting Dr. Shore's testimony.

25        The record therefore contains substantial evidence that could lead a reasonable mind to agree

26   with the ALJ's conclusion that Dr. Shore's consultative evaluation was not consistent with the

27   medical record as a whole and was internally inconsistent.  The ALJ therefore provided specific and

28   legitimate reasons for rejecting Dr. Shore's opinions, and it was not error to do so.

## VIII. CONCLUSION

For the foregoing reasons, the court finds that substantial evidence supported the ALJ's decision to discount Plaintiff's subjective symptom testimony.  Substantial evidence also supports the ALJ's decision to give little weight to the opinion of Dr. Shore.  Defendant's motion for summary judgment is therefore **granted**, and Plaintiff's motion for summary judgment is **denied.**

Dated:  February 8, 2015

_____
DONNA M. RYU
United States Magistrate Judge